RECEIVED
IN ALEXANDRIA, LA

JUL 23 2009
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

HENRY YOUNG,
    Appellant

CIVIL ACTION
NO. CV08-0474

VERSUS

U.S. Commissioner of Social
Security,
    Appellee

JUDGE JAMES T. TRIMBLE
MAGISTRATE JUDGE JAMES D. KIRK

### REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Henry Young ("Young") filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") on August 12, 2004, alleging a disability onset date of July 17, 2004 (Tr. pp. 90, 538) due to "stent in heart, heart disease, fusion of spine, osteoarthritis in both knees, foot was crushed and repaired but still causes pain" (Tr. p. 114). Those claims were denied on November 22, 2004 (Tr. p. 75).

A de novo hearing was held before an administrative law judge ("ALJ") on August 15, 2006, at which Young appeared with his attorney, a medical expert, and a vocational expert ("VE") (Tr. p. 542). The ALJ found that, although Young suffers from severe impairments of widespread degenerative disc disease in the lumbosacral and thoracic spine and osteoarthritis of the knee greater on the left than the right, and has a significant history for myocardial infarction treated with stenting in the right

coronary artery, he has the residual functional capacity to perform nearly the full range of sedentary work. The ALJ concluded that Young can perform work existing in significant numbers in the national economy such as surveillance system monitor, order clerk, or final assembler and, therefore, Young was not disabled within the meaning of the Social Security Act at any time through the ALJ's decision on October 5, 2006 (Tr. p. 49).

On review, the Appeals Council vacated the ALJ's decision and remanded the case for evaluation of the opinion of Dr. Jerome Arimura, a treating physician, reconsideration of Young's residual functional capacity, and to obtain supplemental evidence from a vocational expert if necessary (Tr. pp. 87-88).

A second hearing was held before an ALJ on December 5, 2007, at which Young appeared with his attorney and a vocational expert (Tr. p. 591). The ALJ found that Young suffers from severe impairments of coronary artery disease, degenerative disc disease, status post lumbar fusion, and anxiety disorder (Tr. p. 17). The ALJ also found that Young has the residual functional capacity to perform a limited range of sedentary work (Tr. p. 17), cannot perform his past relevant work, is a younger individual, has a limited education, and is able to communicate in English (Tr. p. 23). The ALJ concluded that, since Young is able to perform sedentary, unskilled work existing in significant numbers in the national economy such as order clerk, telephone quotation clerk,

and surveillance system monitor, Young was not under a disability as defined in the Social Security Act at any time through the date of his decision on December 20, 2007 (Tr. pp. 24-25).

Young again requested a review of the ALJ's decision, but the Appeals Council declined to review it and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner") (Tr. p. 6).

Young next filed this appeal for judicial review of the Commissioner's final decision. Young contends on appeal that:

1. The ALJ failed to discuss all of Young's exertional limitations in accordance with 20 C.F.R. 404.1545, SSR 96-8p, and SSR 96-9p.

2. The ALJ failed to comply with SSR 83-14 when trying to apply the Medical Vocational Guidelines as a framework.

3. The ALJ relied on facially unreliable VE testimony as it is inconsistent with the DOT without providing an explanation justifying the deviation.

4. The record is incomplete.

The Commissioner filed a brief in response to Young's appeal. Young's appeal is now before the court for disposition.

### Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial,

3

it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical

evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988);
Dellolio, 705 F.2d at 125.

## Eligibility for SSI

To qualify for SSI benefits, a claimant must file an
application and be an "eligible individual" as defined in the Act.
42 U.S.C. 1381(a). Eligibility is dependent upon disability,
income, and other financial resources. 42 U.S.C. 1382(a). To
establish disability, plaintiff must demonstrate a medically
determinable physical or mental impairment that can be expected to
last for a continuous period of not less than 12 months. Plaintiff
must also show that the impairment precludes performance of the
work previously done, or any other kind of substantial gainful
employment that exists in the national economy. 42 U.S.C.
1382(a)(3).

## Summary of Pertinent Facts

Young was 35 years old when he filed his application for
benefits, and was 38 years old at the time of the ALJ's December
2007 decision (Tr. p. 23), had an eighth grade education (Tr. p.
120), and had past relevant work as a handyman (2003-2004), a
boilermaker (1999-2000 and 2001), a laborer (1999), a truck driver
(1991), and a laborer/truck driver (1990) (Tr. p. 123).

### 1. Medical Records

In 1991, Young injured his back and neck in a motor vehicle
accident (Tr. p. 188). In January 1994, Young underwent a lumbar

laminectomy, discectomy L4-5, and fusion L4 to S1 with electrical stimulator to correct a herniated nucleus pulposus at L4-5 (Tr. pp. 186, 280-282). Dr. R. Dale Bernauer, an orthopedic surgeon, performed that surgery (Tr. p. 187). Young then had a second surgery to remove the electrical bone growth stimulator (Tr. p. 189).

In September 1998, Dr. Bernauer stated that Young was 28 years old, 5'10" tall, weighed 200 pounds, complained of back pain, left leg pain to above the knee, and occasional numbness to his foot (Tr. p. 188). Dr. Bernauer found that Young walked with a limp on his left leg, his back flexion was 50 degrees, extension was 10 degrees, right and left flexion were 10 degrees, straight leg raising was positive on the left, and his dorsiflexors, extensor hallucis longus, plantar flexors, and hamstrings were weak on the left (Tr. p. 188). Dr. Bernauer stated that he believed Young had a 50 % permanent disability to his back, and that Young cannot lift more than ten to twenty pounds and cannot stoop, crawl, or climb (Tr. p. 189).

In November 2001, Dr. Stephen Flood, an orthopedic surgeon, evaluated Young for left knee problems (Tr. pp. 240-241). Dr. Flood found no atrophy in Young's lower extremities, but he had a small joint effusion on the left and marked tenderness (Tr. p. 240). An MRI of the left knee showed moderate joint effusion and a posterior horn medial meniscal tear in his left knee; Dr. Flood

recommended a left knee arthroscopy with possible meniscal repair and prescribed Darvocet (Tr. p. 241). Dr. Lynn Foret, an orthopaedic surgeon, also evaluated Young's knee in January 2002 and supported Dr. Flood's recommendation of an arthroscopy, stating that Young would not be able to return to work until his knee was repaired (Tr. pp. 243, 267). Young underwent the surgery with Dr. Flood in March 2002 (Tr. pp. 244, 266), then received physical therapy with moderate progress, increasing the tone and strength of his left lower extremity and improving his range of motion and activities of daily living (Tr. pp. 245, 263, 298-349). However, Young continued to have a patella shift and pop during exercises, which hindered progress (Tr. p. 245).

In August 2002, Dr. Foret re-evaluated Young's left knee and found mild narrowing and degenerative changes at the medial joint line of the left knee (Tr. p. 246). Dr. Foret recommended a repeat MRI to the left knee and Hyalgan injections (Tr. p. 247). In September 2002, Dr. Flood gave Young a 58% permanent partial impairment rating regarding his left knee (Tr. p. 248) and a 25% whole body permanent and partial impairment rating (Tr. pp. 258, 260). In October 2002, Dr. Foret recommended physical therapy to eliminate the crunching and grinding in Young's left knee, as well as an arthroscopy and repeat MRI; Dr. FOret stated Young could probably perform some sedentary work (Tr. pp. 249-250, 367-368).

In December 2002, Young had a repeat MRI on his left knee,

which showed wear and tear and osteochondral changes to the medial joint line and no large defects (Tr. p. 251). Dr. Flood recommended that Young see a vocational rehabilitation specialist for training and employment at a sedentary to light level (Tr. p. 256). In March 2003, Dr. Foret found pain and swelling and trouble with full extension in the left knee and prescribed Hyalgan injections (Tr. pp. 251, 363). In April 2003, Dr. Flood stated that Young have been released to sedentary work, was still having some problems with his left knee, had a history of back pain with numbness with prolonged sitting, had significant reading problems, and needed vocational rehabilitation (Tr. p. 147). Young began taking Hyalgan injections in May 2003 (Tr. p. 146), which improved Young's left knee by June 2003, but his right knee began to be symptomatic; Dr. Foret prescribed physical therapy and agreed with Dr. Flood that Young could be released to light work, but no boilermaker work (Tr. pp. 252-254, 351-361).

In September 2003, Dr. Foret again examined Young's left knee and diagnosed chondromalacia (Tr. p. 150). Dr. Foret found some grinding, crepitus, and effusion in Young's left knee, but found his gait, joints, ranges of motions, strength, and tone were otherwise normal.

In April 2004, Young underwent a pain assessment at the Rove Medical Clinic (Tr. pp. 206-211). Young was diagnosed with intolerance to NSAIDS, anxiety stress syndrome, and L-S spine

syndrome with radiculopathy, and was prescribed Lorcet, Soma, and Xanax (Tr. p. 211). Young continued to receive treatment there through July 2006, his compliance with his medications was noted, and his anxiety was controlled (Tr. pp. 212-239).

In July 2004, Young, then 34 years old, was admitted to the hospital for evaluation of an acute myocardial infarction; Young had no history of coronary artery disease, high blood pressure, or diabetes, but had a history of heavy tobacco dependence (Tr. pp. 155, 375). Young had the onset of a severe substernal chest pain, diaphoresis, and shortness of breath while water skiing, and an EKG showed an acute inferior myocardial infarction (Tr. p. 155). Young had hypercholesterolemia, his right coronary artery was occluded, and he underwent a thrombectomy and emergency stenting; his left ventricular function was good (Tr. p. 154). Young was prescribed aspirin, Plavix, and Lovastatin (Tr. p. 154).

In October 2004, Young was evaluated by Dr. Amita Toprani, an internist. Dr. Toprani noted Young's history of a back injury in 1991 with a disc bulge in L4-L5, a heart attack in July 2004, and osteoarthritis in his knees (Tr. p. 175). Young complained of shortness of breath on mild exertion, dull chest pain in the center of his chest that occurred daily without any aggravating or alleviating factors, and swelling in his feet (Tr. p. 175). Dr. Toprani found Young was 5' 9 ¼" tall, weighed 209 pounds, had blood pressure of 144/92, had a full range of motion in both upper

extremities and his cervical spine, had lumber flexion of 85 degrees, full ranges of motion in his hips, knees, and ankles, could walk normally, could squat halfway and recover, had normal motor strength bilaterally in all muscle groups, and had normal deep tendons reflexes (Tr. pp. 176-177). A chest x-ray showed borderline cardiomegaly with cardiothoracic ratios of .5 and was otherwise normal, lumbar spine films showed only mild degenerative changes, x-rays of the right knee were normal, and x-rays of the left knee showed mildly decreased joint spaces (Tr. p. 177). Dr. Toprani concluded that Young had a back injury with a slow gait, did not use an assistive device but complained of pain when walking, had a history of myocardial infarction in July 2004 and had mild cardiomegaly, complained of shortness of breath on mild exertion, had chest pain that was not consistent with angina, and had arthritis in the knees with decreased joint space in the left knee and complaints of pain (Tr. p. 177).

In June 2006, Young was examined by Dr. Jerome Arimura, a specialist in urgent care medicine. Young related that he had been rear-ended in a motor vehicle accident in May 2006, which aggravated his prior neck and low back pain the next day, causing a frequent, moderate, aching across his low back which was aggravated by bending, prolonged sitting, prolonged standing, walking, and coughing, and which sometimes radiated down his left leg (Tr. pp. 189, 441). Dr. Arimura noted that Young was 5' 10"

tall and weighed 216 pounds (Tr. pp. 191, 443). Dr. Arimura diagnosed cervical sprain/strain, thoracic sprain/strain, lumbosacral sprain/strain with nonspecific left lower extremity radiculopathy, bilateral sacroiliac syndrome, a prior history of lumbar discectomy and fusion with residual pain which was aggravated by the 2006 moving vehicle accident, a prior history of left knee injury and arthroscopic surgery with residual pain (not affected by the 2006 accident), a prior history of a right elbow fracture with full recovery, and a prior history of a right foot crush injury with full recovery (Tr. pp. 192, 444). An MRI of Young's lumbar spine revealed disc disease at all levels, a 5-6 mm herniation at L3-4 with an annular tear and facet hypertrophy, which makes a significant impression on the spinal canal and neural foramina, a less prominent disc protrusion at L2-3, and an annular tear at the L4-5 level without any definite disc protrusion at that level (Tr. pp. 195, 414). Dr. Arimura recommended chiropractic manipulation, cold packs, and a firm mattress, prescribed Flexeril and Sombra Pain Relieving Gel, and told Young to avoid any lifting, bending over, pulling, twisting, or turning (Tr. p. 192). Dr. Arimura also gave Young and orthopedics referral (Tr. pp. 411, 413). Dr. Arimura further stated that Young has a limitation in the motion of his spine, positive straight leg raising, an inability to ambulate effectively (cannot walk a block at a reasonable pace on a rough or uneven surface, walk enough to shop

or bank, or climb a few steps at a reasonable pace with the use of a single handrail), suffers from moderate pain, cannot bend or stoop, can stand or sit up to fifteen minutes, and can work up to two hours per day (Tr. p. 193).

In June 2006, Young underwent a right and left heart catheterization, with coronary arteriography and left ventriculography, due to unexplained dyspnea (Tr. pp. 202, 378-379). Dr. William R. Condos, a cardiovascular disease specialist, found single vessel coronary artery disease with a widely patent stent in the right coronary artery with mild systolic dysfunction, ejection fraction of 45%, and mild pulmonary hypertension, and possible mild diastolic dysfunction with elevated left ventricular end-diastolic pressure at 16 MMHG (Tr. pp. 203, 380-381).

## 2. First Administrative Hearing

At his administrative hearing on August 15, 2006, Young testified he had just turned 37 years old, was 5' 10" tall, weighed 200 pounds, had weighed as much as 230 pounds in the past, was separated from his wife, and had 2 children (Tr. pp. 548-549). Young's 17 year old daughter lived with him (Tr. p. 550).

Young testified that he drives about one-quarter mile to the store, but cannot drive very long because he cannot sit for very long or drive over bumpy roads (Tr. p. 549). Young's girlfriend and daughter drove him to the hearing (Tr. p. 550). Young testified that he has an eighth grade education and can read a

12

little, do basic math, and handle money (Tr. pp. 550-551). Young does not have any vocational training; he learned on-the-job how to be a boilermaker and drive a truck (Tr. p. 551). Young testified that he last worked for about a week after his heart attack, doing carpentry work (Tr. p. 551). Young testified that before his heart attack, but after his back injury, he tried bartending for a month but had to quit because of back pain (Tr. p. 532). Young testified that he has also been a truck driver and done construction work (Tr. p. 552).

Young was first injured in a motor vehicle accident in 2002 (Tr. p. 552), and had back surgery (a three level fusion) in January 1994 (Tr. p. 553). Young testified that he was on disability from 1992 to 1998, returned to work when his disability income ended, then was hurt again at work in 2001 when he tripped over an electrical cord and tore his left knee (Tr. pp. 553-554). Young had surgery on his left knee in 2002, but testified that it still gives out, pops, and grinds (Tr. p. 554). Young testified that he had not seen a doctor about his left knee since about 2003, when worker's compensation stopped paying (Tr. pp. 554-555). Young testified that he received a settlement of about $30,000 (Tr. p. 555). Young testified that he had a heart attack in July 2004 due to high cholesterol and smoking, and had a stent put in (Tr. pp. 555, 557). Young testified his cholesterol is now controlled with medication, and he no longer smokes as much as he did when he had

his heart attack (Tr. pp. 555-556). Young testified that he had never used illegal drugs (Tr. p. 556). Young testified that he still has chest pain and shortness of breath (Tr. p. 556); his chest pain usually lasts about two hours and is caused by anxiety and stress (Tr. p. 557). Young still sees his cardiologist, Dr. Condos, every month (Tr. p. 558). Dr. Condos ran tests in 2006 and did not find any more clogged arteries (Tr. p. 558). Young testified that the only side effect he has from his heart medication is that he goes to the bathroom a lot (Tr. pp. 558-559).

Young testified that his May 2006 motor vehicle accident caused disc herniation again, for which he is being treated by Dr. Arimura and a pain management doctor (Tr. pp. 559-560). Young stated that his back pain was recurring and had become overwhelming in 2004 (Tr. p. 560).

Young testified that he can walk around a block, can stand for about thirty minutes, can sit up to an hour and a half, cannot bend at the waist to pick something up, can bend his knees a little bit to pick up something that is not heavy, is right-handed, can pick coins up from a table with his fingers, can pick up a glass of water and hold it, and can lift up to twelve pounds but cannot hold it very long (Tr. pp. 561-562). Young testified that he had a crush injury to his right foot several years ago, but that it does not affect his ability to stand (Tr. p. 563). Young also testified that he smokes about one pack of cigarettes a day, but used to

14

smoke three packs a day (Tr. p. 562). Young does not receive any benefits or have any income; his oldest daughter and girlfriend help him with expenses (Tr. p. 564).

Young testified that he has trouble sleeping at night and takes Xanax (Tr. p. 565). Young takes care of his personal hygiene, a but does not cook or grocery shop, or do laundry, housework, or yard work, or do any yard work; his daughter and girlfriend take care of the housework and his neighbors to his yard work (Tr. p. 565). Young testified that he sits around the house, watches TV, visits neighbors, and takes naps once or twice a day for a couple of hours at a time (Tr. pp. 565-566). Young testified that if he gets out and does too much, he hurts later (Tr. p. 567).

Young testified that his cholesterol is controlled with medication (Tr. p. 564). Young said he cannot work because of pain and shortness of breath, and because his left leg gives out (Tr. p. 567). Young testified that his energy level is very low, and that walking to the mail box or to a neighbor's house tires him quickly (Tr. p. 567). Young has stabbing pains in his lower back, shooting pain in his left leg, numbness in his toes, and his left leg gives out sometime (Tr. p. 568). Young has popping, grinding, and moderate pain in his left knee, which is made worse by walking (Tr. p. 569). Young's right knee also gets sore and stiff and pops once in a while, but is not as bad as his left knee (Tr. p. 570). Young testified that his medication alleviates a lot of his pain, but not

all of it (Tr. p. 569). On a good day, Young can walk around the
block and visit a neighbor, but on a bad day, Young cannot leave
his house due to severe pain (Tr p. 589). Young testified that he
has bad days two to three days per week (Tr. p. 589).

Dr. Earl Beard, a cardiologist, testified that he reviewed the
medical evidence in Young's case and heard Young's testimony (Tr.
p. 571). Dr. Beard testified that Young has widespread
degenerative disc disease involving the lumbar and thoracic spine,
some osteoarthritis in the knee, the left knee had been
symptomatic, and he had a myocardial infarction which was treated
with an angioplasty and stenting (Tr. pp. 571-572). Dr. Beard
testified that there is a slight elevation in the systolic
pressures of the right ventricle and pulmonary artery which is
likely a consequence of a lung disease from smoking (Tr. p. 572).
Dr. Bears also testified that Young's chest pain is atypical and
there is no reason for it (Tr. p. 583).

Dr. Beard testified that Young does not meet or equal Listings
1.02 or 1.04 for his musculo-skeletal impairments because he does
not have motor loss, muscular atrophy, or sensory reflex changes,
and does not meet Listing 4.04 for coronary artery disease (Tr. pp.
572-577). Dr. Beard also testified that Young should be limited for
preventive purposes to lifting no more than ten pounds, have a sit-
stand option at work, and no climbing ropes, ladders, or scaffolds
(Tr. pp. 574-575). Dr. Bear testified that Young's ability to lift

was limited due to his herniations at two levels which impinge on his spinal cord and neural foramina (Tr. p. 550).

The VE testified that Young's past relevant work was heavy and medium (Tr. p. 584). The ALJ posed a hypothetical question involving a person of Young's age, education, and work history, who can lift/carry less than ten pounds frequently and ten pounds occasionally, can stand/walk up to four hours in an eight hour day, can sit up to six hours in an eight hour day, must have a sit-stand option which allows him to change position every 30 to 60 minutes, can occasionally climb ramps and stairs but cannot climb ropes, ladders, or scaffolds, cannot work at unprotected heights or around dangerous moving machinery, and can occasionally stoop, crouch, and balance but cannot kneel, or crawl (Tr. pp. 585-586). The VE testified that such a person could not perform Young's past relevant work, but could do sedentary, unskilled work such as surveillance system monitor, order clerk, and final assembler.

In response to the VE's second hypothetical question, involving a person with all of the limitations to which Young had testified, the VE testified the person would not be able to perform Young's past relevant work and would not be able to perform any work on a full time basis due to the inability to sit for more than one to one and a half hours (Tr. pp. 586-587).

In response to Young's hypothetical question involving a person who must take a ten minute break every hour to alleviate lower back

pain, the VE testified that most employers at the unskilled, sedentary work level would not tolerate that many breaks in a work day (Tr. p. 587). The VE also testified that most employers would not tolerate an absence of one day a week (due to back pain) (Tr. pp. 587-588). Finally, the VE testified that a person who had to be prompted to stay on task every thirty to forty minutes, due to medication or pain, would not be able to maintain competitive employment (Tr. p. 588).

### 3. Second Administrative Hearing

At the administrative hearing on December 5, 2007, Young appeared with his attorney and a vocational expert (Tr. p. 591). Young testified that he was 38 years old, divorced, had two children who lived with their mother (19 years and 1 ½ years old), did not pay child support, lived in his camper in a mobile home park, and was not working (Tr. pp. 598-599). Young testified that his girl friend and his cousin supported him (Tr. p. 599). Young testified that he owns a 1995 Mercury Cougar which his girlfriend also uses; his girlfriend paid for his car insurance (Tr. p. 617).

Young testified that he completed the eighth grade, can read and write, and last worked in 2002 as a self-employed handyman (Tr. pp. 599-600). Young testified he stopped working as a handyman when he had a heart attack (Tr. p. 600). Young testified that he stopped taking his medications, except pain and anxiety medications, because he cannot afford them; his heart medication is very expensive (Tr.

pp. 601-603). Young testified that his right knee pops and grinds, and his left leg has burning pain because of his back problems (Tr. p. 605). Young testified that his car was rear-ended in 2003 or 2004, which caused soft tissue injuries to his back and neck (Tr. p. 607). Young testified that he uses a TENS unit (borrowed from his cousin) in the evenings (Tr. p. 609). Young also testified that he is in pain every day and he gets headaches a lot (Tr. p. 609). Young testified that he still smokes less than a pack a day; before his heart attack, Young smoked three packs a day (Tr. p. 613).

Young suffered a crush injury to his right foot in the past and he had three surgeries on it (Tr. pp. 622-623). Young testified that he had a skin graft on his foot that did not heal correctly and that, on the side of his arch, the skin "busts open and cracks" (Tr. p. 623). Young testified the skin on his foot cracks open if he walks a lot or stands a lot (Tr. p. 623). Young testified that, because his right foot cracks open, he tends to put most of his weight on his left leg when he stands, which causes his left leg to give out (Tr. p. 623).

Young testified that he can sit for thirty minutes to an hour at a time before he has to change position, stand for twenty to thirty minutes, lift ten or twenty pounds, and walk comfortably about 100 yards before he has to stop, catch his breath, and sit or lie down (Tr. p. 614). Young testified that he has been short of breath ever since his heart attack (Tr. p. 616), but he does not

have emphysema (Tr. p. 617). Young further testified that, on a bad day, he lays down to alleviate lower back pain two to three times a day, for up to an hour each time, and he has bad days about three times a week (Tr. pp. 625-626). Young usually naps for about an hour one to three times a day (Tr. p. 631). Young also testified that he could probably pick up a gallon of milk about ten times (Tr. p. 626). Young testified that he can only sweep or vacuum for about ten to twenty minutes because it is difficult to twist his lower back very much (Tr. p. 628). Young also testified that he has difficulty washing dishes (Tr. p. 628). Young testified that he can drive thirty minutes to an hour before he needs to stop and walk around (Tr. p. 628). Pain prevents him from sitting down through an entire movie, and he cannot play video games when he is in a lot of pain (Tr. p. 630).

Young testified that he cannot work because of pain, headaches, and anxiety (Tr. p. 622). Young testified that, if he had to spend about four hours a day on his feet, it would increase the pain in his neck, knees, and back (Tr. p. 624). Young testified that his Xanax makes him drowsy for four to six hours, so he has trouble paying attention (Tr. p. 624), and that pain makes it difficult for him to concentrate (Tr. p. 629). Young testified that his pain is constant and that, on a scale of 1 to 10, his worst pain is an 8 or 9, which eases 60 to 70 percent within about 45 minutes when he takes medication (Tr. pp. 631-632). Young testified that his back

pain has become more severe over time since 1993 (Tr. p. 633).

The VE testified that Young's handyman work was medium level, skilled work, his boilermaker job was heavy, semi-skilled work, and his laborer work was medium and semi-skilled (Tr. p. 635).

The ALJ posed a hypothetical question to the VE that involved a younger individual with an eighth grade education, who can read and write, can lift 20 pounds occasionally and 10 pounds frequently, needs a sit-stand option, can walk four hours in an eight hour day, cannot climb stairs, ladders, ropes, or scaffolds, cannot run, needs limited exposure to dust, fumes, gases, and chemicals, cannot work at heights, on uneven surfaces, or around dangerous machinery or heavy equipment, cannot stoop, kneel, crawl, or twist, can occasionally bend, crouch, and balance, can understand simple instructions, concentrate and perform simple tasks (one and two step work), and can respond and adapt to workplace changes and supervision (Tr. pp. 635-636, 639). The VE testified that such an individual cannot perform any of Young's past relevant work and has no transferable work skills, but can do light, unskilled jobs such as cashier (DOT 211.462-010, OES 49023) (18,800 jobs in the state and 1.2 million nationally), lobby attendant or usher (DOT 334.667-010, OES 68021) (1900 jobs in the state and 109,000 nationally), or marking clerk (DOT 209.587-034) (1000 jobs in the state and 89,000 jobs nationally) (Tr. pp. 636-638).

The ALJ posed a second hypothetical question involving the same

elements as the first except the individual only has an exertional ability to lift ten pounds occasionally and five pounds frequently, and can only walk two hours in an eight hour day (Tr. pp. 636-637). The VE testified that such an individual can perform sedentary, unskilled work such as food and beverage order clerk (DOT 209.567-014) (260 jobs in the state and 27,500 nationally), telephone quotation clerk ((DOT 237.367-046) (1000 jobs in the state and 75,000 nationally), and surveillance system monitor (DOT 379.367-010) (1000 jobs in the state and 50,000 nationally) (Tr. pp. 637-638).

The VE further testified that, if the individual must lie down once or twice a day for an hour, or lost focus four hours a day due to medication side effects, he would not be able to maintain competitive employment (Tr. pp. 638-639).

### ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Young (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A

finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Young has not engaged in substantial gainful activity since August 12, 2004, and has severe impairments of coronary artery disease, degenerative disc disease, status post-lumber fusion, and anxiety disorder, but does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 17). The ALJ also found that Young is unable to perform his past relevant work (Tr. p. 23).

At Step No. 5 of the sequential process, the ALJ further found that Young has the residual functional capacity to lift and carry five pounds frequently and ten pounds occasionally, requires a sit/stand option, can walk two hours in an eight hour day, is unable

to run or climb stairs, ladders, ropes, and scaffolds, cannot be exposed to dangerous machinery, heavy equipment, unprotected heights, or uneven surfaces, can occasionally bend, crouch, and balance, cannot stoop, kneel, crawl, or twist, cannot be exposed to dust, fumes, gases, and chemicals, and can understand simple instructions, concentrate on and perform simple tasks, and respond to and adapt to changes in the workplace and supervision (Tr. p. 17). The ALJ further found the claimant is a younger individual with a limited education, the ability to communicate in English, and no transferable work skills (Tr. p. 23). The ALJ concluded there are a significant number of sedentary, unskilled jobs in the national economy which Young can perform, such as order clerk, telephone quotation clerk, and surveillance system monitor (Tr. pp. 23-24) and, therefore, Young was not under a "disability" as defined in the Social Security Act at any time from the date of his application on August 12, 2004, through the date of the ALJ's decision on December 20, 2007 (Tr. pp. 24-25).

Law and Analysis

## Ground No. 1 - Exertional Limitations

First, Young contends the ALJ erred in failing to discuss all of his exertional limitations in accordance with 20 C.F.R. 404.1545, SSR 96-8p, and SSR 96-9p. Young contends the ALJ failed to discuss the impact of his sit/stand option on his job base and failed to specify the frequency and duration of the need to alternate between

sitting and standing as required by SSR 96-9p.[1]

A social security ruling interprets the Social Security Act and does not have the effect of law. <u>Wagner v. Finch</u>, 413 F.2d 267 (5th Cir. 1969). Social Security Rulings are agency rulings published under the authority of the Commissioner of Social Security and are binding on all components of the administration. <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 n.9, 110 S.Ct. 885, 891 n.9 (1990). However, procedural perfection in administrative proceedings is not required. <u>Mays v. Bowen</u>, 837 F.2d 1362, 1364 (5th Cir. 1988). A claimant is only entitled to relief if he can show that he was prejudiced by the failure of the ALJ to follow the social security ruling. See <u>DeLeon v. Barnhart</u>, 174 Fed.Appx. 201, 203 (5th Cir. 2006), citing <u>Mays v. Bowen</u>, supra. The major policy underlying the harmless error rule is to preserve judgments and avoid waste of time. <u>Mays v. Bowen</u>, supra.

In the case at bar, the ALJ failed to specify the frequency of

_____

[1] Social Security Ruling 96-9p (July 2, 1996) states in pertinent part: "Alternate sitting and standing: An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work."

Young's sit/stand option, as required by SSR 96-9p. However, as other courts have found, since the ALJ failed to specify a frequency, it is assumed that the "sit/stand option" given by the ALJ was implicitly "as needed" or "at will." A sit/stand option as needed necessarily encompasses frequent sitting and standing, allowing an employee broad flexibility, and thus has a more restrictive effect on the jobs available to him. See Ketelboeter v. Astrue, 550 F.3d 620, 626 (7th Cir. 2008); Williams v. Barnhart, 140 Fed.Appx. 932, *4 (11th Cir. 2005). It is also noted that Young failed to develop this issue at his administrative hearing; he did not ask the VE any questions regarding the impact of the sit-stand option for the specific jobs found by the VE. Therefore, Young has not shown that he was prejudiced by the ALJ's failure to specify a frequency or duration for the sit/stand option.

Since the error was harmless, this ground for relief is meritless.

Grounds 2 & 3 - Medical Vocational Guidelines

Next, Young contends the ALJ erred in failing to comply with SSR 83-14 when trying to apply the Medical Vocational Guidelines as a framework. Young further contends the ALJ erred in relying on the facially unreliable VE testimony, which was inconsistent with the DOT and did not provide an explanation justifying the deviation.

Young's argument appears to hinge on the erroneous belief that the ALJ relied on the grids in making his determination that Young

was not disabled. Under 20 C.F.R. pt. 404, subpt. P, App.2, §
200.00( e)(2), when the rules in Appendix 2 are not fully applicable
due to an impairment or combination of impairments resulting in both
strength limitations and nonexertional limitations, the rules in
this Appendix 2 are considered in determining first whether a
finding of disabled may be possible based on the strength
limitations alone and, if not, the rule(s) reflecting the
individual's maximum residual strength capabilities, age, education,
and work experience provide a *framework* for consideration of how
much the individual's work capability is further diminished in terms
of any types of jobs that would be contraindicated by the
nonexertional limitations. However, full consideration must be
given to all of the relevant facts in the case in accordance with
the definitions and discussions of each factor in the appropriate
sections of the regulations, which will provide insight into the
adjudicative weight to be accorded each factor.

In the case at bar, the ALJ considered the medical-vocational
guidelines in Appendix 2 as a framework, or a starting point, before
considering the specific factors relevant in Young's case and the
vocational expert's testimony. Therefore, the ALJ did not find that
Young is not disabled based on the medical-vocational guidelines.
Instead, the ALJ relied on the VE's testimony to support his finding
that Young is not disabled.

Young further argues that the VE and ALJ erred in finding he

27

could work as an order clerk, a telephone quotation clerk, or a surveillance system monitor since, according to the Dictionary of Occupational Titles ("DOT"), those jobs all require a reasoning level of 3.[2] Young contends the reasoning level required for those jobs exceeds the mental limitations posed in the ALJ's hypothetical question to the VE, which specified a mental ability to understand simple instructions and concentrate on and perform simple tasks.

Young states in his brief that the VE testified that he understood the ALJ's reference to the ability to "understand simple instructions [and] concentrate on and perform simple tasks" to mean "simple one or two-step tasks." However, Young also contends in his brief that "this part of the VE's testimony is missing from the record." This court finds that testimony is in the administrative record, in a dialogue between Young's attorney and the VE (Tr. p. 639):

> "Q.  And then one last question.  I didn't quite – I tried to write this down fast enough, but the judge

---

[2] The Dictionary of Occupational Titles describes the jobs of order clerk-food and beverage (DOT 209.567-014)(260 jobs in the state and 27,500 nationally), telephone quotation clerk (financial institutions)(DOT 237.367-046)(1000 jobs in the state and 75,000 nationally), and surveillance system monitor (DOT 379.367-010)(1000 jobs in the state and 50,000 nationally) as requiring Level 3 reasoning.

Reasoning level three is defined as the ability to apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form, and deal with problems involving several concrete variables in or from standardized solutions.  Dictionary of Occupational Titles, Appendix III, "03 Level Reasoning Development," available at http://www.oalj.dol. gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

mentioned simple instructions and simple work tasks or something like that. That's basically one-step, two-step type work?

"A. That's correct. Everything would be unskilled then.

"ATTY: That's all the questions I have, Your Honor."

Therefore, the VE's testimony is not missing from the administrative transcript.

At his administrative hearing, Young did not raise or develop an issue as to possible conflicts between the reasoning level intended by the ALJ in his hypothetical and the reasoning level required for the jobs specified by the VE. Young only asked the VE whether he understood the ALJ to mean one and two step work, which the VE said he did. All kinds of implicit conflicts are possible and the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation. The Fifth Circuit has held that claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing. Carey v. Apfel, 230 F.3d 131, 142 (5th Cir. 2000), and cases cited therein. Therefore, possible conflicts between vocational expert testimony and the Dictionary of Occupational Titles should be developed at the administrative level though adversarial cross-examination of the vocational expert

witness. Claimants can test the VE's expert opinion that there is no conflict with the DOT by routinely asking them to recite for the record the reasoning abilities and worker trait characteristics that the DOT attributes to each job that the vocational expert testifies that a hypothetical person with the same limitations as the claimant can still perform. Claimants can then develop any apparently contrary requirements through cross-examination. Carey, 230 F.3d at 147. Since Young did not develop the evidence as to this issue at his administrative hearings, he cannot raise it now in this court.

Finally, Young compares his case to one involving a person with borderline intellectual functioning; the obvious flaw in that argument, however, is that there is no evidence that Young has borderline intellectual functioning. In fact, Young's prior work as a boilermaker required a reasoning level of 4. DOT 805.261-014. Although the VE testified that Young's prior work as a boilermaker, as he described it, actually seemed to fall somewhere between a boilermaker (reasoning level 4) and a boilermaker helper (reasoning level 2 or 3, DOT 805.261-010 and DOT 805.381-101)(Tr. p. 625), it appears that Young has done work in the past that involved at least a reasoning level of 3.

Therefore, these grounds for relief are meritless.

Ground No. 4 - Incomplete Record

Finally, Young contends "a material portion of the transcript

is missing from the record," beginning with Tr. p. 639. However, the only evidence Young specifies as missing is VE testimony regarding the effects of various limitations in the form of hypothetical questions, and the VE's testimony that he understood the ALJ to mean simple one and two step tasks and instructions.

As previously noted, the VE's testimony as to one and two step work is included in the administrative transcript (Tr. p. 639), and there is also testimony by the VE as to the effects of limitations (Tr. pp. 637-638). The transcript concludes with Young's attorney saying, "That's all the questions I have, Your Honor" (Tr. p. 639). Therefore, the transcript before this court appears to be complete; Young has not pointed to any specific testimony that is, in fact, missing.

This ground for relief is meritless.

### Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Young's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District

Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 23rd day of July, 2009.

_____
JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE